# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

SHAWN MACE,

        Plaintiff,

v.

        **MEMORANDUM OF LAW & ORDER**
        Civil File No. 11-0477 (MJD/LIB)

NORMAN JOHNSON, M.D.,
SCOTT D. HABLE,
RENVILLE COUNTY, and
3 UNNAMED RENVILLE COUNTY
CORRECTIONAL OFFICERS,

        Defendants.

Daniel E. Gustafson, Amanda M. Williams, Joseph C. Bourne, and Lucy G. Massopust, Gustafson Gluek PLLC, Counsel for Plaintiff.

Stephen O. Plunkett and Jonathan P. Norrie, Bassford Remele, Counsel for Defendant Norman Johnson.

Jason M. Hiveley and Andrea B. Wing, Iverson Reuvers Condon, Counsel for Defendants Renville County, Scott Hable, and 3 Unnamed Renville County Correctional Officers.

## I.    INTRODUCTION

    This matter is before the Court on Defendants Scott D. Hable's, Renville

County's, and 3 Unnamed Renville County Correction Officers' Motion for

Summary Judgment [Docket No. 75]; Defendant Norman Johnson, M.D.'s

Motion for Summary Judgment [Docket No. 92]; Plaintiff Shawn Mace's Motion

for Summary Judgment Against Defendant Norman Johnson, M.D. [Docket No.

98]; Plaintiff Shawn Mace's Motion to Exclude Report and Testimony of Expert

Mobin Ahmed Malik, M.D., M.S. [Docket No. 102]; and Plaintiff Shawn Mace's

Motion for Summary Judgment Against Defendants Scott D. Hable, Renville

County, and 3 Unnamed Renville County Correctional Officers [Docket No. 107].

The Court heard oral argument on October 8, 2013.

Because Mobin Ahmed Malik's report would be useful to a jury but

aspects of it would be unfairly prejudicial, the Court grants in part and denies in

part Plaintiff Shawn Mace's Motion to Exclude Report and Testimony of Expert

Mobin Ahmed Malik, M.D., M.S. and orders that that the phrase "deliberate

indifference" be stricken from Dr. Malik's testimony.  Because there are genuine

issues of material fact surrounding Defendant Norman Johnson's conduct, the

Court denies both Plaintiff's Motion for Summary Judgment Against Defendant

Norman Johnson, M.D. and Defendant Norman Johnson, M.D.'s Motion for

Summary Judgment.  Because qualified immunity applies and because Plaintiff

has made an inadequate showing of how County policies were the moving force

behind any individual liability, the Court grants Defendants Scott D. Hable's,

Renville County's, and 3 Unnamed Renville County Correction Officers' Motion

for Summary Judgment and denies Plaintiff Shawn Mace's Motion for Summary

Judgment Against Defendants Scott D. Hable, Renville County, and 3 Unnamed

Renville County Correctional Officers.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Plaintiff's Personal History

In 1992, Plaintiff Shawn Mace was involved in an automobile accident that

led to a spinal-fusion procedure. (Bourne Aff., Docket No. 101, Ex. E, at 4; Ex. K,

at MACE-000173; Ex. I, at MACE-000100.)  The procedure caused Plaintiff to

have chronic back pain.   (Ex. K, at MACE-000173.)  For this pain, Plaintiff was

prescribed several medications, including OxyContin and Oxycodone. (Ex. K, at

MACE-000173; see Ex. E, at 4-5; Bourne Aff., Docket No. 101, Ex. L, at MACE-

000178.)

In 2008, Plaintiff was arrested for selling marijuana, and in February 2009,

he was incarcerated in Redwood County Jail ("Redwood").  (Bourne Aff., Docket.

No. 101, Ex. A, Mace Dep. 33:2-8, 31:25-32:15; 73:15-74:13; Ex. N, at RENVILLE

0001.)  He remained at Redwood for approximately 12 days.  (Mace Dep. 73:23-

25.)  Because of overcrowding at Redwood, however, Plaintiff was transferred to

Renville County Jail ("Jail").  (Mace Dep. 73:23-74:1; Schlegel Aff., Docket No. 80,

Ex. A.)  Defendant Scott D. Hable serves as Sheriff of Renville County.  (Am.

Compl. ¶ 4, Docket No. 36; see Renville County Defs.' Answer ¶ IV.)

### 2.   March 2, 2009: Plaintiff's Intake at the Jail

Plaintiff arrived at the Jail on March 2, 2009.  (Ex. N, at RENVILLE 0001.)

During Plaintiff's transfer, a deputy was given Plaintiff's medications at

Redwood, and the deputy delivered the medications to the Jail along with

Plaintiff.  (Mace Dep. 74:9-13.)  These medications included Gabapentin,

Oxycodone, and OxyContin.  (Bourne Aff., Docket No. 101, Ex. O, at RENVILLE

0002.)  Gabapentin is a drug used to treat seizures, but it is also used to treat

pain.  (Smith Aff., Docket No. 78, Ex. E, N. Johnson Dep. 23:11-20.)  Oxycodone

and OxyContin are both opiates used to treat pain.  (N. Johnson Dep. 24:24-

25:18.)

Defendant Renville County (the "County") has contracted with Advanced

Correctional Healthcare, Inc. ("ACH") to provide medical care for its inmates at

the Jail.  (See N. Johnson Dep., Ex. 6, ACH Contract 1-5.)  ACH specializes in

correctional medical care and treats detainees at 230 jails.  (N. Johnson Dep.

4

110:20-111:1.)  ACH is responsible for inmate medical care, and its doctors make

decisions about prescriptions.  (See Smith Aff., Docket No. 78, Ex. C, Musich

Dep. 24:14-20; ACH Contract 1-2.)

The County pays ACH a fixed monthly fee for their services, and the fee is

adjusted quarterly based on the population of the Jail.  (See ACH Contract §§ 3.1,

3.2.)  The County itself employs nurses who visit the Jail regularly.  (Smith Aff.,

Docket No. 78, Ex. D, E. Johnson Dep. 26:12-19, 22-24.)  However, County nurses

and Correctional Officers ("COs") are not authorized to make medication

decisions.  (Smith Aff., Docket No. 78, Ex. B, McDowell Dep. 40:16-23; Musich

Dep. 24:14-20.)

Plaintiff's medical intake was conducted by Nurse Jolene Schlegel, who

evaluated Plaintiff regarding his medical condition.  (See Schlegel Aff., Exs. A, B.)

Plaintiff reported to Nurse Schlegel that he had undergone back surgery in 1998

and that he had needed increased doses of OxyContin and Oxycodone since

then.  (Ex. I, at MACE-000100.)  Nurse Schlegel obtained a medical release form

from Plaintiff during their meeting. (Ex. I, at MACE-000100.)

Nurse Schlegel then called Defendant Dr. Norman Johnson ("Defendant

Johnson") on the phone.  (Bourne Aff., Docket No. 101, Ex. D, Def.'s Supp.

Answers Pl.'s Interrogs., Interrog. No. 1.)  Defendant Johnson is the owner and

Chief Executive Officer of ACH.  (See N. Johnson Dep. 18:22-19:3.)   During their

call, Nurse Schlegel told Defendant Johnson what Plaintiff had reported to her

during the examination.   (Def.'s Supp. Answers Pl.'s Interrogs., Interrog. No. 1.)

Nurse Schlegel also told Defendant Johnson about Plaintiff's "pill count."  (N.

Johnson Dep. 106:24-107:6.)  She explained that Plaintiff was missing pills, based

on the dates of his prescriptions and dosage amounts.  (N. Johnson Dep. 107:22-

23.)  Defendant Johnson became concerned about the missing pills because, to

him, that fact indicated that Plaintiff was "either . . . taking them, which would

certainly be dangerous, or . . . selling them, which would not be good."  (Smith

Aff., Docket No. 78, Ex. E, N. Johnson Dep. 107:19-108:3.)

Defendant Johnson decided that he should discontinue Plaintiff's

OxyContin prescription for the following reasons: (1) Plaintiff was missing pills

and likely overusing them, (2) Plaintiff had a history of drug problems, and (3)

Plaintiff was arrested for a drug offense and was thus at high risk for becoming

addicted to his prescription drugs.  (N. Johnson Dep. 107:19-108:3, 118:7-18.)

Defendant Johnson wanted to discontinue what he thought was the most

dangerous drug on Plaintiff's prescription list.  (N. Johnson Dep. 112:5-13.)

6

Defendant Johnson discontinued Plaintiff's OxyContin prescription, continued Plaintiff's Oxycodone prescription, and ordered Plaintiff be weaned off Gabapentin.  (N. Johnson Dep. 108:10-17, 111:23-112:2; see Schlegel Aff., Ex. A (showing that Plaintiff was to be given Gabapentin "until gone").)  Regarding the Gabapentin, Defendant Johnson chose to continue it for a time because he was "unclear about the nature of [Plaintiff's] described pain."  (N. Johnson Dep. 23:21-23.)  With respect to the OxyContin and Oxycodone, Defendant Johnson thought it would be wiser to eliminate only one of the two opiates, not both, because "cut[ting Plaintiff] off completely" would create a greater chance for side effects.  (N. Johnson Dep. 25:10-13, 108:18-23.)  Defendant Johnson then instructed Nurse Schlegel to watch Plaintiff for signs of withdrawal.  (Schlegel Aff., Ex. B, at RENVILLE 0008.)  Later on, Dr. Paul E. Thompson, ACH doctor and the Jail's Medical Director (now deceased), signed off on Defendant Johnson's decision.  (See N. Johnson Dep. 97:3-24.  See generally Schlegel Aff., Ex. B.)

Defendant Johnson did not view Plaintiff's medical records or personally attempt to obtain them to verify Plaintiff's prescriptions.  (N. Johnson Dep. 14:23-15:6; 21:12-19, 96:16-22;  see Def.'s Supp. Answers Pl.'s Interrogs., Interrog. No.

1.)  Defendant Johnson claims this is something the nursing staff at the Jail does.

(N. Johnson Dep. 14:23-15:6.)  The only information Defendant Johnson knew

about Plaintiff when he made his decision was the information he received via

telephone conference with Nurse Schlegel.  (N. Johnson Dep. 21:12-19;  Def.'s

Supp. Answers Pl.'s Interrogs., Interrog. No. 1.)  Additionally, Defendant

Johnson did not personally meet or speak with Plaintiff on March 2.  (Docket No.

37, Def.'s Answer Pl.'s First Am. Compl. ¶ XI.)  In Defendant Johnson's opinion,

an in-person medical assessment was not necessary, as it is common practice in

jails and nursing homes to conduct these decisions over the phone.  (N. Johnson

Dep. 110:10-19.)

Later that day, at 5:22 p.m., Nurse Schlegel faxed Plaintiff's medical release

to the Twin Cities Pain Clinic.  (Schlegel Aff. Ex. C.)  This fax read: "Our faculty

MD is requesting medical records to provide proper continuity of care."

(Schlegel Aff., Ex. C.)  Around 6:00 p.m., Plaintiff saw Nurse Schlegel again.

(Schlegel Aff. ¶ 3, Ex. B, at RENVILLE 0008 – RENVILLE 0009.)  He and Nurse

Schlegel discussed his medication changes, and Plaintiff agreed that he would be

referred to Dr. Edmund Nadolny, the Jail psychologist.  (Nadolny Aff. ¶ 1,

Docket No. 90; Schlegel Aff. ¶ 3, Ex. B, at RENVILLE 0008 – RENVILLE 0009.)

### 3.    March 3, 2009: Plaintiff's Symptoms and Emergency Room Visit

Plaintiff claims that he suffered withdrawal symptoms on March 3, 2009. (See Ex. I, MACE-000101; Bourne Aff., Docket No. 101, Ex. J, MACE-000112.) However, Defendant Johnson and the Renville Defendants dispute whether Plaintiff truly suffered withdrawal at all.  (See N. Johnson Dep. 12-13,113-14.) Plaintiff vomited and hallucinated that day, and Jail staff noted that he was incoherent when asked questions.  (Ex. I, at MACE-000101.)  Defendant Johnson asserts that these symptoms were not consistent with narcotic withdrawal because they occurred too soon, and, in Defendant Johnson's experience, certain symptoms that Plaintiff suffered are not usual for patients suffering withdrawal. (N. Johnson Dep. 12:8-13:9,113:7-115:1.)

On the "Officer Pass On Information" Form ("OPIF") from the shift ending at 6:00 a.m. on March 3, 2009, Nurse Schlegel left directions to the COs of the next shift to watch Plaintiff for signs of withdrawal.  (Schlegel Aff., Ex. E.)  Officers prepare OPIFs to pass on important information to subsequent shifts, which are typically 12 hours and staffed by two COs.  (E. Johnson Dep. 33:25-34:7, 35:15-22.) Officers Sarah Nelson and Lance Peterson (who Plaintiff seeks to name as defendants in this action) were the COs responsible for Plaintiff on March 3,

9

2009.  (Mace Dep. 120:5-8; Peterson Aff., Docket No. 81; Nelson Aff., Docket No. 85.)  At an unknown time on March 3, Plaintiff told the COs around him that he wanted to speak to Dr. Johnson because he was at risk of suffering withdrawal; his request, however, was denied.  (Mace Dep. 82:1-83:12, 86:21-24, 130:25-132:5; see also N. Johnson Dep. 13:10-13.)  At another point that day, Plaintiff recalls telling the COs that what he was going through was very dangerous, it was unwise to be off of his medication, and that he thought he was going to die.  (Mace Dep. 130:25-132:5, 134:11-136:14.)

Around 4:00 p.m., CO Peterson noted that Plaintiff had confused CO Peterson for Plaintiff's brother.  (See Peterson Aff., Ex. A, at RENVILLE 0033.)  Then, at 4:50 p.m., Plaintiff was taken to see jail psychologist Dr. Edmund Nadolny as a result of Plaintiff's request for care.  (Ex. I, MACE-000102; Nadolny Aff., Ex. B, Req. Slip Medical Care; Peterson Aff., Ex. A, at RENVILLE 0033.)  Dr. Nadolny did not make any urgent recommendations based on his assessment of Plaintiff's condition.  (See Nadolny Aff., Exs. A, B.)

At 5:00 p.m. on March 3, CO Carolyn Fiecke noted that Plaintiff indicated that he was "feeling fine."  (Peterson Aff., Ex. A.)  At 5:30 p.m., CO Lance Peterson reported that Plaintiff was sleeping.  (Peterson Aff., Ex. A.)  Then, at

6:00 p.m., CO Fiecke observed that Plaintiff was in pain.  (Peterson Aff., Ex. A.)

COs Peterson and Fiecke then noted on their OPIF for the next shift that Plaintiff

should be watched: "Mace – watch him / you may have to call the Dr." (Peterson

Aff., Ex. B.)

CO Nelson observed that Plaintiff was "a little bit tipsy" when she

delivered his evening meal.  (Nelson Aff., Ex. A.)  About ten minutes later,

Plaintiff told CO Nelson that he had been vomiting and had experienced

diarrhea.  (Nelson Aff., Ex. A.)  After CO Peterson and Nelson went to Plaintiff's

room to check on him, they found that he was "visibly ill" and could "barely

walk."  (Peterson Aff. ¶ 4; Nelson Aff., Ex. A.)  CO Peterson "basically carried"

Plaintiff from his room in the "A-pod" area of the Jail to an observation cell in the

booking area.  (Peterson Aff. ¶ 4; Nelson Aff., Ex. A.)

Around 7:00 p.m., when Plaintiff's condition did not improve, CO

Peterson called an ambulance.  (Peterson Aff. ¶ 4.)  Plaintiff was then transported

by ambulance to the Renville County Hospital Emergency Department.

(Peterson Aff. ¶ 4.)  Dr. Paul Thompson treated Plaintiff at the emergency room,

and upon discharging Plaintiff, Dr. Thompson decided to reinstate Plaintiff's

OxyContin prescription to its original pre-intake dosage as a result of the

emergency room visit.  (Bourne Aff., Docket No. 101, Ex. Q, RENVILLE 0035;

McDowell Dep. 10:2-3, 10:10-11.)  Plaintiff recalls that the "ER room doctor" said

that Plaintiff's OxyContin should have not been discontinued so abruptly.  (Mace

Dep. 90:11-22.)

### 4. Events after March 3, 2009

On March 4, 2009, the Jail received Plaintiff's medical records from the

Twin Cities Pain Clinic; the records were sent to Dr. Thompson for review.

(Schlegel Aff., Exs. B, at RENVILLE 0044; C.)  From March 4 to March 10, Plaintiff

was given his medication as instructed by Dr. Thompson.  (Ex. Q, at RENVILLE

0035; Schlegel Aff., Exs. D, F.)  However, Plaintiff claims that his experience on

March 3 led him to attempt suicide by hanging himself with tube socks in a

lounge area at the Jail on March 10, 2009.  (Mace Dep. 97:23-98:12; Musich Dep.

12:19-13:15.)  Plaintiff claims that his experience on March 3, coupled with his

March 10 suicide attempt, caused him to be disabled.  (See Mace Dep. 41:22-

43:13, 93:20-94:2; Ex. M, MACE 000186.)

### 5. County Policies and Procedures

Later reflecting on the events of March 3, Defendant Johnson opined that

the COs "followed their policy and procedure as well as anything that we had

recommended that they implemented." (N. Johnson Dep. 104:2-12.) The Jail

operates according to several policies and procedures. (See generally E. Johnson

Dep., Ex. 2, Policies and Procedures Manual.) County policies require an

interview at booking and a medical screening. (Policies and Procedures Manual

109-111, 264.) There are no known County policies that require doctors to speak

with inmates or view their medical records before altering their prescriptions.

(E. Johnson Dep. 27:2-13.) The County's policy also requires that a health

assessment is completed for detainees within 14 days of incarceration. (Policies

and Procedures Manual 265.)

   According to its policies, the Jail considers a "healthcare authority" to be

someone appointed by the sheriff "to oversee the medical operations of the jail."

(Policies and Procedures Manual 226.) This "responsible physician" is someone

who can be retained by contract. (Policies and Procedures Manual 226.) It is also

County policy that "[t]he responsible physician . . . be contacted for the approval

of all prescription medications." (Policies and Procedures Manual 280.)

   County policy also requires that COs check on inmates every 30 minutes,

24 hours a day. (Policies and Procedures Manual 78-79.) Jail staff is required to

be trained in first aid and in recognizing signs and symptoms of illness and

chemical dependency.  (Policies and Procedures Manual 223.)  Finally, inmates

are able to request medical assistance from qualified medical staff or a physician,

and emergency medical care is available 24 hours a day.  (Policies and

Procedures Manual 272, 274.)

### B.   Procedural History

On February 25, 2011, Plaintiff filed a lawsuit in this Court against Dr.

Norman Johnson, Scott D. Hable, Renville County, and three unnamed Renville

County Correctional Officers.  The Amended Complaint alleges Count One:

Cruel and Unusual Punishment in Violation of the Eighth Amendment and 42

U.S.C. § 1983 (against all Defendants).  Plaintiff; Defendant Johnson; and

Defendants Scott D. Hable, Renville County, and three unnamed Renville

County Correctional Officers (collectively, "Renville Defendants") now each

move for summary judgment on the claim.  Plaintiff seeks to name COs Lance

Peterson and Sarah Nelson as two of the three unnamed Renville County COs,

and asks the Court to dismiss his claim against the third.  Defendant Johnson

attached the declaration of expert Mobin Malik, M.D. to his Motion for Summary

Judgment.  Plaintiff has filed a motion to exclude Malik's testimony.

## III.   DISCUSSION

### A.   Plaintiff's Motion to Exclude

14

The Court first considers Plaintiff's Motion to Exclude Report and Testimony of Expert Mobin Ahmed Malik, M.D., M.S. [Docket No. 102]. Defendant Johnson attached the Declaration of Dr. Mobin Malik to his Motion for Summary Judgment. In his report, Dr. Malik opines that Defendant Johnson's decision to discontinue Plaintiff's OxyContin prescription was appropriate. Dr. Malik concludes that the decision was appropriate for the following reasons: (1) Plaintiff had a history of chemical dependency, (2) Plaintiff had been arrested on drug charges, (3) Plaintiff was missing 60 OxyContin pills when he arrived at the Jail, and (4) Plaintiff's medical records indicated that he overused OxyContin in the past. Dr. Malik also asserts that Defendant Johnson was trying to protect Plaintiff because Plaintiff's potential overuse of OxyContin showed that he was a potential safety risk to himself. Dr. Malik posits that continuing OxyContin at the same dosage could have resulted in Plaintiff's overdose and possible death. Therefore, Dr. Malik suggests that it was right for Defendant Johnson to modify Plaintiff's medication. Finally, Dr. Malik points out that withdrawal is not as deadly as overdose, so Defendant Johnson was reasonable in weighing the risks in favor of discontinuing the OxyContin.

Plaintiff asks the Court to exclude Dr. Malik's testimony, claiming that it is irrelevant, unreliable, and fails to meet technical specifications.  The Court holds that the report is admissible but sentences containing the phrase or variations of the phrase "deliberate indifference" are stricken.

District courts act as gatekeepers and must ensure that expert testimony is both relevant and reliable.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591-93 (1993).  Federal Rule of Evidence ("FRE") 702 requires that the expert testimony be relevant, that the witness be qualified, and that the evidence be reliable.  Additionally, FRE 403 provides that evidence may be excluded if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury . . . ."

Expert testimony, however, should only be excluded when it is "so fundamentally unsupported that it can offer no assistance to the jury." Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 865 (8th Cir. 2004). Furthermore, "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006) (citation omitted).

First, Plaintiff argues that Dr. Malik's testimony is irrelevant under FRE 702 because Dr. Malik considers information that was not available when Defendant Johnson made his decision.  Specifically, Dr. Malik considered Plaintiff's medical records, which were not available to Defendant Johnson when he made the decision to discontinue Plaintiff's prescription.  Plaintiff also argues that Dr. Malik's statements reflect an erroneous belief that Plaintiff was a new inmate, not a transferee, because he assumed there was a possibility that Plaintiff had been overusing OxyContin right before he arrived at the Jail.  The Court holds that, while Dr. Malik's report may contain certain faulty premises, these flaws are not so great as to render his opinion irrelevant.  Rather, these concerns should only limit the weight to which a jury gives Dr. Malik's testimony in assessing its credibility.  The Court concludes that Dr. Malik's testimony offers some assistance to a jury notwithstanding the flaws noted by Plaintiff.

Second, Plaintiff claims that Dr. Malik's testimony misleads the jury because it confuses the issues, as Dr. Malik uses the language of two different legal standards: he notes "deliberate indifference" in some places, but explains that Defendant Johnson acted "reasonably" or "appropriately" in other places. This argument is unpersuasive.  It is true that deliberate indifference claims are

17

not simply negligence claims or claims for medical malpractice; those claims do not rise to the level of a constitutional violation.  See Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) ("Mere negligence or medical malpractice . . . are insufficient to rise to a constitutional violation.").  Furthermore, plaintiffs must show more than negligence or gross negligence to succeed in their deliberate indifference claim.  See Popoalii v. Corr. Med. Servs., 512 F.3d 488 (8th Cir. 2008).

Nevertheless, asserting that Defendant Johnson acted reasonably is an appropriate counterweight to the allegation that he acted with deliberate indifference because it addresses Plaintiff's attempts to show that Defendant Johnson's medical care was so far below the reasonableness standard as to constitute deliberate indifference; therefore, using "reasonableness" is a logical rebuttal to the claim.  See Pool v. Sebastian Cnty., 418 F.3d 934, 942 (8th Cir. 2005) ("[M]edical treatment may so deviate from the applicable standard of care as to evidence . . . deliberate indifference.") (internal quotation marks omitted); Doe v. City of St. Louis, No. 4:10-CV-2158-JAR, 2012 WL 1134032, at *3 (E.D. Mo. Apr. 4, 2012) ("It is clear, however, that deliberate indifference may be demonstrated by showing that medical treatment deviated from the applicable standard of care.

Often whether such a significant departure from professional standards occurred is a factual question requiring expert opinion to resolve.") (citations omitted) (internal quotation marks omitted); <u>Cummins v. Ferguson</u>, Civil No. 09-5173, 2011 WL 4072176, at *8 (W.D. Ark. Aug. 1, 2011) ("[I]ssues of fact exist when there is a question of . . . whether the decisions made by medical staff fell so far below the reasonable standard of care as to constitute deliberate indifference."). Accordingly, the Court therefore concludes that the report's reference to reasonableness does not cause its probative potential to be outweighed by the danger of jury confusion.

Third, Plaintiff asserts that Dr. Malik's report is inadmissible under FRE 703 because it unfairly prejudices Plaintiff. Plaintiff points out that Dr. Malik speaks to the ultimate issue of the case and uses the legal term "deliberate indifference" in a way that will likely confuse the jury and cause jurors to give the assessment too much weight. The Court finds no issue flowing from Plaintiff's contention that Dr. Malik speaks to the ultimate issue in the case, as the Eighth Circuit has held that expert opinion on the ultimate jury question is permissible. <u>See</u> <u>United States v. Two Eagle</u>, 318 F.3d 785, 792-93 (8th Cir. 2003).

Nevertheless, Dr. Malik's use of "deliberate indifference" is more of a concern.  See Bruner-McMahon v. Sedgwick Cnty. Bd. of Comm'rs, No. 10-cv-1064-KHV, 2012 WL 33837, at *6 (D. Kan. Jan. 6, 2012) ("[E]xperts may not testify that someone was 'deliberately indifferent,' because that is a legal conclusion reserved for the trier of fact based upon the facts provided at trial and the law provided by the court.")  While the Eighth Circuit in Two Eagle provided that use of legal phrases with overlapping meanings in everyday parlance are permissible in expert reports (e.g., "serious medical need"), the Court concludes that "deliberate indifference" is nonetheless problematic because it is a legal phrase that contemplates criteria not adequately explored in the report and has potential to confuse a jury.  See id.

Furthermore, unlike "serious medical need," "deliberate indifference" does not simply mean what plain language might suggest (e.g., that someone purposefully behaved in a careless manner).  Rather, the phrase has a more nuanced meaning, describing an actor's decision to consciously disregard a serious medical need in the manner and to the extent contemplated by various cases.  Additionally, the policy considerations explored in Two Eagle—that medical experts should not be precluded from using the terms of their field—

does not apply here; "deliberate indifference" is not known to be medical term of

art.  Therefore, while <u>Two Eagle</u> applies, its application is somewhat limited

here.  Accordingly, the Court concludes that the phrase "deliberate indifference"

has a plain meaning that does not encompass its legal meaning, and Dr. Malik's

report does not sufficiently explain or define that meaning.  This presents an

appreciable risk of jury confusion.  Therefore, the Court grants Plaintiff's motion

in part insofar as the following sentences (or portions of sentences) in Dr. Malik's

report be stricken as shown:

- "That testimony further supports and confirms my opinion that Dr.

  Johnson's care and treatment of Mr. Mace was appropriate under the

  circumstances ~~and was not deliberately indifferent to Mace's medical~~

  ~~needs~~."  (Malik Decl. ¶ 3, Docket No. 95.)

- "I will testify that ~~at no time did Dr. Johnson act with deliberate~~

  ~~indifference to Mr. Mace's safety – to the contrary,~~ Dr. Johnson's plan to

  discontinue Oxycontin, and instruction that he be watched for

  signs/symptoms of withdrawal, was specifically designed for his

  safety." (Malik Decl., Ex. A, at 3.)

- "~~This could have in no way been construed as an exhibition of deliberate indifference toward Mace~~." (Malik Decl., Ex. A, at 4.)

- "~~At no time was Dr. Johnson's instruction to withhold Oxycontin indifferent to Mr. Mace's needs – to the contrary,~~ Dr. Johnson was mindful of the safety risk and that he had to proceed cautiously." (Malik Decl., Ex. A, at 4.)

- "In my opinion, ~~at no time did Dr. Johnson act with deliberate indifference to Mr. Mace's safety – to the contrary,~~ Dr. Johnson's plan to discontinue Oxycontin, and instruction that he be watched for signs/symptoms of withdrawal, was specifically designed for his safety." (Malik Decl., Ex. A, at 5.)

Finally, Plaintiff argues that Dr. Malik's testimony is not compliant with Federal Rule of Civil Procedure 26(a)(2)(B) because it is missing the following items: (1) a list of cases occurring within the last four years where the expert has been qualified and (2) the compensation to be paid to the expert. Plaintiff also suspects that Dr. Malik's list of publications is not comprehensive. Federal Rule of Civil Procedure 26(a)(2)(B) prohibits use of evidence, unless the failure to disclose was justified or is harmless. An omission is harmless "when there is no

prejudice to the party entitled to the disclosure." <u>Nguyen v. IBP</u>, 162 F.R.D. 675,

680 (D. Kan. 1995).

First, the Court concludes that Plaintiff's suspicion that Dr. Malik's list of

publications is incomplete is unfounded; nothing suggests that the publication

list is not comprehensive.  Additionally, the omissions of cases and

compensation in Dr. Malik's report were harmless because that missing

information was supplied to Plaintiff by Defendant Johnson via email.  (Norrie

Decl., Docket No. 118, ¶ 2; Norrie Decl. Ex. A.)  Therefore, the use of Dr. Malik's

report is not prohibited under 26(a)(2)(B).   Pursuant to Federal Rule of Civil

Procedure 26(a)(4) and in light of the email correspondence between the parties,

the Court deems it unnecessary for Defendant Johnson to formally write, sign,

and serve this information for the purposes of the summary judgment motions

before the Court at this time.  However, the Court orders that this information be

added to Dr. Malik's amended report; a new report shall be filed with the

omissions of "deliberate indifference" noted above and with the information

required by 26(a)(2)(B), for future reference in this matter.

### B.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### C.    42 U.S.C. § 1983 Standard

To prevail in a 42 U.S.C. § 1983 suit, a plaintiff must establish (1) that he

was deprived of a right secured by the Constitution or laws of the United States

and (2) that the deprivation was committed under color of state law.  Gomez v.

Toledo, 446 U.S. 635, 640 (1980).  Section 1983 "is not itself a source of substantive

rights, but merely provides a method for vindicating federal rights elsewhere

conferred."  Graham v. Connor, 490 U.S. 386, 393-94 (1989) (citation omitted).

Prisoners' § 1983 claims based on deliberate indifference to a serious medical

need raise concerns under the Eighth Amendment prohibition on cruel and

unusual punishment.  McCaster v. Clausen, 684 F.3d 740, 746 (8th Cir. 2012).

If a prisoner is a pretrial detainee, however, his or her claim is properly analyzed as a Fourteenth Amendment due process claim.  Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979).  Nevertheless, the Eighth Circuit has held that pretrial detainees are entitled to "at least as great protection as that afforded convicted prisoners under the Eighth Amendment."  Owens v. Scott County Jail, 328 F.3d 1026, 1027 (8th Cir. 2003) (internal quotation marks omitted).  Plaintiff was a pretrial detainee in the present case.  Therefore, Plaintiff's claim is brought under the Fourteenth Amendment, but it is properly analyzed using the Eighth Amendment standard.

### D.    Section 1983 Claim Against Defendant Johnson

Plaintiff has alleged that Defendant Johnson acted with deliberate indifference in making the decision to discontinue Plaintiff's OxyContin prescription without viewing Plaintiff's medical records or taking measures to assess Plaintiff's medical condition beyond his phone conversation with Nurse Schlegel.  Finding a genuine issue of material fact on the issue of deliberate indifference, the Court denies both Plaintiff's Motion for Summary Judgment against Defendant Johnson and Defendant Johnson's Motion for Summary Judgment.

Prison administrators and agents violate the Eighth Amendment if their "acts or omissions [are] sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). A claim for deliberate indifference has both objective and subjective components. Thompson v. King, 730 F.3d 742, 746 (8th Cir. 2013). First, the plaintiff must show that there was an objectively serious medical need. Id. (quoting McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009)). Second, the plaintiff must demonstrate "that the defendant actually knew of, but deliberately disregarded, such need." Id.

To show that a defendant knew of but deliberately disregarded an objectively serious medical need, "the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." Id. at 746-47 (citation omitted). This is a high standard, and "requires a showing more than negligence, more even than gross negligence, but less than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate." Id. at 747 (internal quotation marks and citations omitted). Furthermore, it is not enough to show that someone acted unreasonably in response to a known risk. Id.

### 1.    Deliberate Indifference versus Independent Medical Judgment

Plaintiff argues that Defendant Johnson's decision to discontinue Plaintiff's OxyContin prescription without consulting his medical records or meeting with him was deliberate indifference to a serious medical need.  Conversely, Defendant argues that Plaintiff's deliberate indifference claim fails as a matter of law because it is based only on a disagreement as to what medical treatment was proper, and Defendant Johnson is entitled to make a reasonable medical judgment.  The Court finds genuine issues of fact as to whether Defendant Johnson's conduct amounted to deliberate indifference or falls within the realm of independent medical judgment.

Absent deliberate indifference, inmates do not have a right to receive a specific or desired course of treatment.  Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997).  Prison doctors are "free to exercise their independent medical judgment."  Id.  Furthermore, disagreement with a doctor's medical treatment decisions is not enough to establish a deliberate indifference claim.  Cooke v. Stanton, No. 08-1175(MJD/JJK), 2009 WL 424537, at *5-6 (D. Minn. Feb. 18, 2009) (holding that a prisoner's allegations that his doctors deliberately disregarded his serious medical need when they discontinued his previously prescribed

medications was merely a disagreement over treatment decisions, which is not

sufficient to establish a deliberate indifference claim).

Defendant Johnson claims that Plaintiff merely disagrees with his reasoned

medical judgment to discontinue one of three pain medications, and this

dissatisfaction with Defendant Johnson's course of treatment does not mean that

deliberate indifference occurred.  Indeed, the Eighth Circuit in Smith v.

Marcantonio, 910 F.2d 500, 502-03 (8th Cir. 1990), held that a claim that a prisoner

should have received more pain medication than prison personnel were willing

to provide represented a mere disagreement over treatment decisions.  Smith

involved more informed medical personnel than the present case, however: the

prison personnel in Smith understood the nature of that prisoner's pain and

medical condition because his injury occurred while he was at the prison.  See id.

at 501-02.  By contrast, Defendant Johnson did not fully understand Plaintiff's

medical condition because he did not look into his medical records, meet with

Plaintiff, or exhibit awareness of Plaintiff's stay at Redwood.

This distinction could lead a reasonable juror to question whether

Defendant Johnson's decision to discontinue Plaintiff's OxyContin prescription

can even be fairly characterized as a sound medical judgment, considering

Defendant Johnson did not gather or consider certain information before making a decision that risked serious implications.  Other courts have found that this type of failure—one in which a physician does not take adequate steps to gain necessary medical information—amounts to a complete lack of care, which in turn amounts to deliberate indifference.  See, e.g., Steele v. Shah, 87 F.3d 1266, 1267 (11th Cir. 1996) (holding that a jury could find deliberate indifference where a prison doctor only had a list of an inmate's medications and met with the inmate for less than one minute before deciding to discontinue all of his psychotropic medication); Greason v. Kemp, 891 F.2d 829, 840 (11th Cir. 1990) (holding that a reasonable juror could find that a prison psychiatrist acted with deliberate indifference when, after only spending a few minutes with the inmate and without reviewing his medical records, the psychiatrist abruptly discontinued the inmate's medication); Andrews v. Ferguson, Civ. No. 09-5080, 2010 WL 3853070, at *10 (W.D. Ark. Aug. 30, 2010), adopted by 2010 WL 3843769 (W.D. Ark. Sept. 27, 2010) (denying summary judgment where medical staff did not obtain the inmate's treatment plan, and concluding that Plaintiff's objections to his treatment were more than just a mere disagreement).

However, each of these cases present facts where a complete deprivation of medication occurred; here, Defendant Johnson only discontinued one of Plaintiff's three pain medications.  Thus, Defendant Johnson provided some pain management to Plaintiff.  Notwithstanding, the Court concludes that the evidence could support a finding of deliberate indifference because "mere proof of medical care by a doctor consisting of diagnosis only [does not] suffice[] to disprove deliberate indifference," and deliberate indifference can be "grossly incompetent or inadequate" medical care as well as "a doctor's decision to take an easier and less efficacious course of treatment."  Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990).  Therefore, the Court concludes that the fact Defendant Johnson continued some of Plaintiff's prescriptions does not preclude a finding of deliberate indifference.

Defendant Johnson notes that, in some analogous cases, no effort was made to obtain medical information, while, in the present case, Nurse Schlegel requested Plaintiff's medical records.  However, this case is not just about medical records.  The totality of Defendant Johnson's conduct must be assessed.  The issue is more precisely about whether Defendant Johnson collected enough information to sufficiently understand Plaintiff's condition before making such

an important treatment decision.  One piece of information that may have influenced his decision was Plaintiff's time at Redwood.  Had Defendant Johnson inquired about Redwood, asked Redwood personnel about his missing pills, or simply spent more time looking into Plaintiff's medical and arrest history, he may have questioned the merits of his assumption that Plaintiff was at high risk for overdose.  He may then have taken another course of action (e.g., weaned Plaintiff off of OxyContin rather than abruptly discontinued the prescription).  Thus, Nurse Schlegel's request for medical records does not necessarily mean that Defendant Johnson's reasoning was sound; it remains that Defendant Johnson made a decision based solely on what appears to be a cursory and speculative phone conversation.

As a result, a reasonable juror could find that Defendant Johnson's decision was not a reasoned medical judgment.  While medical judgment and deliberate indifference are opposing concepts, analysis of the two concepts is not completely binary.  In other words, while existence of a reasoned medical judgment means there is no deliberate indifference, a finding that Defendant Johnson's decision was <u>not</u> a medical judgment does not necessarily mean that deliberate indifference occurred.  Assuming Defendant Johnson's decision was

not a reasonable medical judgment, the elements of deliberate indifference still must be met.  The Court will now address these elements in turn.

A plaintiff alleging deliberate indifference must first show that there was an objectively serious medical need.  Thompson, 730 F.3d at 746.  Second, the plaintiff must demonstrate "that the defendant actually knew of, but deliberately disregarded, such need."  Id.

### 2.   Serious Medical Need

While Defendant Johnson does not contest that there was an objectively serious medical need here, the Renville Defendants—whose motion depends, in part, on the Court's determination of Defendant Johnson's liability—argue that no serious medical need was present because OxyContin withdrawal is not a serious medical need.  However, the Court concludes that Plaintiff's medical condition of chronic back pain amounts to an objectively serious medical need.

An objectively serious medical need is a need that has been diagnosed by a physician as requiring treatment.  Jones v. Minn. Dep't of Corrs., 512 F.3d 478, 481 (8th Cir. 2008) (quoting Camberos v. Branstad, 512 F.3d 174, 176 (8th Cir. 1995)).  It can also be a need that is so obvious that even a "layperson would easily recognize the necessity for a doctor's attention."  Id.

Here, Plaintiff's substantial back pain resulting from his injury from the car accident was a serious medical need because his past physicians diagnosed the pain and treated it with OxyContin. This is indicated in the record by medical documentation describing Plaintiff's injuries and his prescription for OxyContin and other drugs to treat back pain. (Bourne Aff., Ex. K, at MACE-000173.) Therefore, the Court concludes that Plaintiff suffered a serious medical need, and it was known to Defendant Johnson through his conversation with Nurse Schlegel.

The Renville Defendants argue that there was no serious medical need at all because Plaintiff self-reported his back pain and reliance on OxyContin, with no official records to verify what he said. The Renville Defendants argue that this self-reporting was insufficient because a plaintiff's self-diagnosis cannot create a serious medical need. They assert that serious medical needs must either be diagnosed by a doctor or be obvious to a layperson, and Defendant Johnson did not have enough information to confirm Plaintiff's medical condition, nor was he present to observe anything that might be considered "obvious."

The Court finds this argument to be unpersuasive because there is independent evidence in the record of Plaintiff's prescriptions and back injury.

See Kayser v. Caspari, 16 F.3d 280, 281 (8th Cir. 1994) (holding that there was no serious medical need when the only evidence in the record was Plaintiff's self-report).  Accordingly, the Court concludes that Plaintiff had an objectively serious medical need.

### 3.      Deliberate Disregard of the Serious Medical Need

Plaintiff argues that Defendant Johnson deliberately disregarded Plaintiff's serious medical need because Defendant Johnson did not meet with Plaintiff at all or access his medical records.  Plaintiff asserts that these actions would have given Defendant Johnson important information that would have allowed him to decide how to appropriately treat Plaintiff.  Plaintiff concludes that Defendant Johnson's decision to discontinue the OxyContin was not an individualized determination.  Defendant Johnson argues that he did not deliberately disregard Plaintiff's serious medical need because the information communicated during his phone call with Nurse Schlegel was sufficient, and he did not need a face-to-face meeting or examination to make a reasoned medical judgment about Plaintiff's treatment.  Furthermore, Defendant Johnsons argues that his decision to discontinue Plaintiff's OxyContin was a reasoned decision based on valid factors about Plaintiff, namely that he was missing OxyContin pills, likely

overusing his medication, and at risk because of his addiction history.  Therefore,

Defendant Johnson asserts that his decision was indeed an individualized

medical judgment; it was not a complete lack of care.  The Court concludes that

the evidence supports a reasonable jury finding for either party; there is evidence

to support that Defendant Johnson acted with deliberate indifference, and

evidence to support that he did not.

There is a question of material fact as to whether or to what extent

Defendant Johnson departed from the professional standard of care when he

decided to discontinue Plaintiff's OxyContin prescription based only on what he

learned during his phone call with Nurse Schlegel.  Whether a significant

departure from professional standards occurred is often a question of fact

requiring exploration by expert witnesses.  Moore v. Duffy, 255 F.3d 543, 545 (8th

Cir. 2001).  Plaintiff provides no expert report to address this question.

Defendant Johnson has provided the report by Dr. Malik.  However, Dr. Malik's

expert report is silent on an important factual issue: Plaintiff's status as a

transferee inmate.

Based on the evidence and considering Dr. Malik's report, a reasonable

juror could still find that Defendant Johnson made a dangerous assumption as a

result of learning that Plaintiff was missing OxyContin pills.  He assumed that

Plaintiff was "either . . . taking [the missing pills], which would certainly be

dangerous, or . . . he was selling them, which would not be good."  (Smith Aff.,

Docket No. 78, Ex. E, N. Johnson Dep. 107:19-108:3.)  This reasoning ignored the

fact that Plaintiff had transferred from another jail (Redwood) and may have had

no opportunity to take the pills inappropriately.

Furthermore, there is no evidence that Defendant Johnson considered the

length of time that Plaintiff spent at Redwood (12 days) and whether that

duration was long enough to minimize any risk of overdose.  That Plaintiff was a

transferee inmate is relevant to the determination of whether Defendant Johnson

departed from professional standards in making his decisions in the prison

context.  Dr. Malik states that "when prisoners are going through the intake

process, especially after an arrest on drug charges, the jail physicians do not

know whether the prisoners have [drugs] on-board; thus prudence dictates that a

physician err on the side of caution, as did Dr. Johnson."  (Malik Decl. 3.)  This

statement does not consider that Plaintiff was transferred and arguably does not

apply to Plaintiff because he was not assessed immediately after arrest, when the

concerns about overdose would be heightened.  Without considering that

Plaintiff transferred from another jail, Dr. Malik's assertions that "it was reasonable for Dr. Johnson to have assumed that [Plaintiff] had been using illicit drugs prior to intake—and that he had some on board at the time of intake" seem unfounded.  (Malik Decl. 4.)

This leaves a material fact question for the jury regarding Defendant Johnson's judgment, and the evidence is insufficient to provide the Court with a sense of the appropriate standard of care in that instance.  Therefore, upon considering the record, a reasonable juror could conclude that making a decision to discontinue a strong medication without seeking more information (perhaps from Redwood) may have constituted an omission that could be considered deliberate indifference.  A reasonable juror could find that Defendant Johnson had an intent akin to criminal recklessness by making the assumptions he made about Plaintiff's condition without confirming them, especially in light of the risk of withdrawal, which, while rarely fatal, can still amount to needless suffering.

Conversely, a reasonable juror could find that, despite the risk Defendant Johnson took by discontinuing Plaintiff's OxyContin, that risk was neutralized by (1) his instruction to Jail staff to watch Plaintiff for signs of withdrawal and (2) his decision to continue Plaintiff's Oxycodone prescription.  These measures

could lead a reasonable juror to find that Defendant was not deliberately indifferent after all.

Finally, the Court notes that there are two sources in the record within which a professional standard of care is contemplated: Dr. Malik's expert report and Dr. Thompson's statement to Plaintiff upon discharging him from the emergency room. While Dr. Malik's testimony provides information about an applicable professional standard of care by which to measure most of Defendant Johnson's actions, a reasonable juror could find that the report holds little weight because of its defects. Specifically, Dr. Malik considers information that Defendant Johnson did not consult at the time of his decision (e.g., Plaintiff's actual medical records) and does not address Plaintiff's status as a transferee inmate from Redwood.

A reasonable juror could also determine that Dr. Thompson's statement that Plaintiff should not have been taken off of his medication so abruptly holds little weight. First, this statement is not made in an expert report, and Dr. Thompson is deceased and unavailable to provide a more complete assessment of Plaintiff's medical condition. Additionally, a reasonable juror might note that there is no indication that Dr. Thompson knew about Plaintiff's missing pills,

Plaintiff's addiction history, or any of the other factors that Defendant Johnson

considered.  Based on these observations, a reasonable juror could choose one or

neither source as a guide in assessing the reasonableness of Defendant Johnson's

actions.  Therefore, the assessment of whether Defendant Johnson deviated far

from the applicable standard of care is a question of fact that should be left for

the trier of fact to decide.

In summary, the Court concludes that there is a fact question of whether or

not Defendant Johnson deliberately disregarded Plaintiff's serious medical need

because of the multiple reasonable interpretations of his actions and

assumptions.  There is also a question of whether the decisions made by

Defendant Johnson fell so far below the appropriate standard of care as to

constitute deliberate indifference.  Accordingly, the Court denies both Plaintiff's

and Defendant Johnson's motions for summary judgment on this claim.

### 4.      Whether Defendant Johnson Acted Under Color of State Law

A person who is a willful participant in a joint activity with a state or its

agents acts "under color of state law," even if that person is not a government

officer or employee.  See Dennis v. Sparks, 449 U.S. 24, 27-28 (1980) (internal

quotation marks omitted).  The parties do not dispute this aspect of the claim,

and the Court concludes that Defendant Johnson acted under color of state law

because he was a contract physician with the County and was acting in this

capacity at the time when the relevant events of the underlying claim occurred.

### E.      Claim Against Unnamed Correctional Officers

Plaintiff asks the Court to name additional parties in the case, as he has

identified two of the three unnamed defendants: Renville County COs Lance

Peterson and Sarah Nelson.  Plaintiff asks the Court to dismiss the claim against

the third unnamed defendant.

Service must be made on any defendant within 120 days after the

complaint is filed with the court.  Fed. R. Civ. P. 4(m).  If a defendant is not

served within 120 days, a court must dismiss the action against that defendant,

without prejudice, or order that service be made in a specified time period.  Id.

However, "if the plaintiff shows good cause for the failure, the court must extend

the time for service for an appropriate period."  Id.

The Court denies Plaintiff's the motion to add the two COs to this action.

The Court concludes that it is too late in the litigation to add these parties, as

extensive discovery has been conducted in the case, and it would be unduly

prejudicial to the Renville Defendants to have additional parties added at this

late stage, as adding these parties might require additional discovery from

Defendants.  Additionally, Plaintiff has not shown good cause for failing to add

COs Nelson and Peterson because Plaintiff had multiple opportunities to name

these parties.  Therefore, the Court dismisses the action against the three

unnamed Renville County COs.

Adding COs Nelson and Peterson to this action by amending the

Complaint would also be futile because it is clear that qualified immunity applies

to the COs.  "Qualified immunity is an entitlement not to stand trial or face the

other burdens of litigation.  The privilege is an <u>immunity from suit</u> rather than a

mere defense to liability; and like an absolute immunity, it is effectively lost if a

case is erroneously permitted to go to trial."  <u>Saucier v. Katz</u>, 533 U.S. 194, 200-01

(2001) (citations omitted), <u>overruled in part on other grounds by</u> <u>Pearson v.</u>

<u>Callahan</u>, 555 U.S. 223 (2009).  Therefore, immunity questions should be resolved

"at the earliest possible stage in litigation."  <u>Id.</u> at 201 (citation omitted).

"Evaluating a claim of qualified immunity requires a two-step inquiry: (1)

whether the facts shown by the plaintiff make out a violation of a constitutional

or statutory right, and (2) whether that right was clearly established at the time

of the defendant's alleged misconduct."  <u>Estate of Morgan v. Cook</u>, 686 F.3d 494,

496 (8th Cir. 2012) (citation omitted).

Regarding the second element, no reasonable juror would conclude that the COs realized they were depriving Plaintiff of a constitutional right because, throughout the day on March 3, 2009, they took action.  Perhaps their reactions constituted "bad guesses," but over the course of the day, the COs progressively became more attentive to Plaintiff, and within a relatively short duration, they ultimately ensured that Plaintiff was taken to the hospital.  See Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." (citation omitted)).  Indeed, there was no unlawfulness apparent in the COs' conduct; they responded to Plaintiff's condition within hours of his exhibiting serious symptoms.  Accordingly, the Court concludes that, based on the current evidence, qualified immunity would apply to COs Nelson and Peterson, if added to the action.  Therefore, naming them as defendants would be futile.

### F.    Monell Claim Against Renville County

In his briefs, Plaintiff takes the position that Defendants Renville County and Scott Hable are liable because their unconstitutional policies caused the violation of Plaintiff's Eighth Amendment rights.  Notably, Plaintiff's Amended Complaint does not allege facts providing the basis for a Monell claim.  (See First Am. Compl. 3-5.)  Second, the record is devoid of many facts relating to Sherriff

Hable and his conduct.  Assuming without deciding that Plaintiff correctly

asserts his Monell claim, the Court grants the Renville Defendants' motion for

summary judgment with regard to the Monell claim against the County and

Sheriff Hable and denies Plaintiff's motion for summary judgment on the same

claims.

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation.  But, under § 1983, local governments are responsible only for their own illegal acts.  They are not vicariously liable under § 1983 for their employees' actions.

Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011) (citations omitted).

> Plaintiffs who seek to impose liability on local governments under § 1983 must prove that action pursuant to official municipal policy caused their injury.  Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.

Id. (citations omitted).

> [A] municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom.  For a municipality to be liable, a plaintiff must prove that a municipal policy or custom was the moving force [behind] the constitutional violation.

Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (citations omitted) (internal quotation marks omitted).

"[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." Id. (citation omitted).  Additionally, a county is liable under § 1983 "if an action or policy itself violated federal law, or if the action or policy was lawful on its face but led an employee to violate a plaintiff's rights and was taken with deliberate indifference as to its known or obvious consequences." Pietrafeso v. Lawrence Cnty., 452 F.3d 978, 982 (8th Cir. 2006).  The county will also be liable if the challenged policy led an agent of the county to violate a plaintiff's rights.  Id.  In the prison context, a contract health care provider is considered an agent of the county.  See West v. Atkins, 487 U.S. 42, 56 (1988).

Plaintiff argues that the individual failures of Defendant Johnson and COs Nelson and Peterson unconstitutionally injured Plaintiff.  It is a general rule in the Eighth Circuit that there can be no municipal liability if individual liability is not first found on the underlying substantive claim.  McCoy v. City of Monticello, 411 F.3d 920, 922 (8th Cir. 2005).  COs Nelson and Peterson are not parties to this action; however, the Court has concluded that COs Nelson and

Peterson would not be liable due to the application of qualified immunity.  With

respect to Defendant Johnson, the Court has denied both motions for summary

judgment, and therefore, a finding of liability may occur.  Therefore, the Court

analyzes the <u>Monell</u> claim arising out of Defendant Johnson's potential liability.

Plaintiff does not assert that the County implemented an unconstitutional

custom because Plaintiff does not refer to any repeated conduct or deprivations

of constitutional rights.  Rather, Plaintiff's arguments center on County policies.

Plaintiff argues that the County's medical policies were unconstitutional because

they empowered Defendant Johnson to violate Plaintiff's rights.  First, Plaintiff

addresses the overall policy of contracting with ACH to provide inmate medical

care, stating that the County attempted to delegate a non-delegable

constitutional duty to provide medical care to inmates.  Plaintiff insists that the

County's policy regarding inmate medical care is illegal because it disclaims

responsibility for medical treatment and is set up so that outside physicians

make all of the Jail's medical decisions.  The Court concludes that Plaintiff's

argument is unpersuasive here, as Plaintiff has no evidence suggesting that ACH

was hired to protect the County from liability.  Even had the County contracted

with ACH for this reason, it would not be insulated from liability.  See <u>Ancata v.</u>

Prison Health Servs., Inc., 769 F.2d 700, 705 (11th Cir. 1985) ("The federal courts have consistently ruled that governments, state and local, have an obligation to provide medical care to incarcerated individuals.") (holding that the duty to provide medical is not discharged by contracting out medical care). Additionally, the evidence does not indicate that any conflict of interest hindered Defendant Johnson's ability to care for the inmates because the County pays a fixed monthly fee to ACH that covers most of the inmates' medication costs.

Next, Plaintiff examines specific policies connected to Defendant Johnson, claiming that certain requirements should have been in place to ensure that Defendant Johnson made an informed medical decision with regard to Plaintiff's care. Plaintiff does not plead which policies drove Defendant Johnson to act in the way he did. Rather, upon review of Plaintiff's briefs, he seems to argue that the County should have required that (1) inmate medical records be sent to ACH doctors, (2) medical examinations be performed sooner than 14 days after inmate intake, and (3) doctors evaluate every inmate. Plaintiff suggests that absence of these policies caused Defendant Johnson's failures, and therefore, the inadequate policies in place were the moving force behind his alleged deliberate indifference.

The Court rejects Plaintiff's arguments here for two reasons.  First, Plaintiff

Plaintiff's grievances regarding the County's policies do not address one of

Defendant Johnson's important omissions, which was not seeking further

information about Plaintiff regarding the risk of overdose (specifically, that he

had transferred from Redwood after 12 days).  Second, Plaintiff has not shown

that any of these policies would have prevented Defendant Johnson's alleged

failure of insufficient fact gathering.  With respect to medical records, for

example, Dr. Johnson's testimony reveals that he still would have come to the

same conclusion to discontinue Plaintiff's OxyContin even had he been required

to examine Plaintiff's medical records.  Dr. Malik's report supports this as well.

This is because Defendant Johnson's decision was based upon more than what

would be found in Plaintiff's medical records; his decision was also based on

assumptions about Plaintiff's addiction history and apparent overuse of

OxyContin.  The presence of medical records would not have changed that

reasoning.

Regarding a policy requiring a medical examination at some point before

14 days after intake, the relationship between that hypothetical policy and

Defendant Johnson's actions is tenuous, as such a policy would not necessarily

prevent any of the conduct that occurred in the case.  This policy change does not

guarantee that Defendant Johnson would have examined Plaintiff before making

the prescription decision; it just means that Defendant Johnson would have had

to examine Plaintiff at some point during his first two weeks at the Jail.  This

policy change does not provide that Defendant Johnson would have seen

Plaintiff in the first two days at the Jail, which is the time period when the

relevant events occurred.

Finally, to require physicians to evaluate every single inmate would not

have necessarily changed Defendant Johnson's determination either.  Had

County policies required Defendant Johnson to conduct a physical examination

of Plaintiff, there is no guarantee that he would not have employed the same

reasoning in making his determination or sought the same information that he

did.

These hypothetical policies show that the relevant omissions leading to a

potential constitutional violation occurred not in the County's policymaking

process, but in Defendant Johnson's individual decision-making process.  By his

own accord, Defendant Johnson simply chose not to make inquiries and made a

decision based on certain assumptions.  Plaintiff has not shown that any specific

policy required Defendant Johnson to make his conclusions, and Plaintiff has not

indicated that any policy change would have required him to change his thought

process.  For a county policy to do such a thing, it would have to be specific

enough to walk a doctor through steps in his or her reasoning about a particular

patient.  The County policies mentioned by Plaintiff do not require or prohibit

conduct to a point of specificity that would allow a reasonable juror to conclude

that they were the moving force behind Defendant Johnson's allegedly faulty

thought process.  Therefore, the Court concludes that Plaintiff has not met his

burden in showing that County policies were the moving force behind

Defendant Johnson's alleged constitutional violation.

Finally, Plaintiff seems to assert a claim against Defendant Hable, to be

joined with the <u>Monell</u> claim against the County.  Plaintiff does not know if he

has ever interacted with Sheriff Hable, but he maintains he is suing Sheriff Hable

in his official capacity as the Sheriff of Renville County and supervisor of the Jail.

(<u>See</u> Mace Dep. 119:14-120:8.)  Plaintiff argues that Sheriff Hable is liable for the

same reasons as the County (outlined above) because he cannot disclaim his non-

delegable duty to provide medical care to inmates by attempting to contract the

duty away to ACH.  Plaintiff relies, in part, on <u>Hartman v. Corr. Med. Servs.,</u>

Inc., 960 F. Supp. 1577, 1583 (M.D. Fla. 1996) (denying a sheriff's motion for summary judgment because his duty to provide inmate medical care was not absolved by a contract with a medical provider, and holding that the sheriff's liability was wholly based on the liability of the medical provider). Hartman is distinct here, however, because the sheriff in that case did not ensure that the medical contractor employed licensed mental health professionals. Also, in Hartman, the sheriff was on notice about issues with the contractor's policy because there had been a recent attempted suicide by an inmate at the jail. Finally, if Defendant Hable is being sued in his official capacity, the Court concludes that he is not liable for the same reasons the County is not; there is no policy shown to be the moving force behind Defendant Johnson's individual liability, and this is required for a Monell claim to succeed.

Because Plaintiff has not shown that County policies were the moving force behind Defendant Johnson's actions, the Court denies Plaintiff's Motion for Summary Judgment Against Defendants Scott D. Hable, Renville County, and 3 Unnamed Renville County Correctional Officers and grants Defendants Scott D. Hable's, Renville County's, and 3 Unnamed Renville County Correction Officers' Motion for Summary Judgment.

Accordingly, based on all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** that:

1.     Plaintiff Shawn Mace's Motion to Exclude Report and Testimony of Expert

       Mobin Ahmed Malik, M.D., M.S. [Docket No. 102] is **GRANTED in part**

       **and DENIED in part**, as set forth in this order;

2.     Defendant Norman Johnson, M.D.'s Motion for Summary Judgment

       [Docket No. 92] is **DENIED**;

3.     Plaintiff Shawn Mace's Motion for Summary Judgment Against Defendant

       Norman Johnson, M.D. [Docket No. 98] is **DENIED**;

4.     Plaintiff Shawn Mace's Motion for Summary Judgment Against

       Defendants Scott D. Hable, Renville County, and 3 Unnamed Renville

       County Correctional Officers [Docket No. 107] is **DENIED**;

5.     Defendants Scott D. Hable's, Renville County's, and 3 Unnamed Renville

       County Correction Officers' Motion for Summary Judgment [Docket No.

       75] is **GRANTED**; and

6.      Scott D. Hable, Renville County, and 3 Unnamed Renville County

Correction Officers are terminated as parties in this matter.

Dated:   February 10, 2014

s/ Michael J. Davis

Michael J. Davis
Chief Judge
United States District Court